**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

---

ERIC SPYRA, individually and
as trustee of the SPURMAXIM, INC.
PROFIT SHARING PLAN, and
ROBERT W. THOMAS, individually and
as the owner of the ROBERT W. THOMAS
ROTH IRA,

          Plaintiffs,                        CASE NO.: 2:19-cv-1110

      vs.                                    JURY TRIAL DEMANDED

THE HEARTLAND CHRISTIAN ADVISORS,
INC., J. WILLIAM GAILBREATH, and
GEORGE D. GURITZ,

          Defendants.

---

## COMPLAINT

---

Eric Spyra ("Spyra"), the Spurmaxim, Inc. Profit Sharing Plan ("Spurmaxim"), Robert

W. Thomas ("Thomas"), and the Robert W. Thomas Roth IRA (collectively, "Plaintiffs"), by and

through their attorneys, Hansen Reynolds, LLC, hereby state their complaint against The

Heartland Christian Advisors, Inc., J. William Gailbreath, and George D. Guritz (collectively,

"Defendants") as follows:

## <u>INTRODUCTION</u>

1.      This case concerns a fraudulent investment scheme promoted by Defendant

George D. Guritz ("Guritz") in which Spyra and Thomas, through investment plans under their

control, each invested $100,000 with Defendant The Heartland Christian Advisors, Inc.

("HCA").

2.      In June 2014, according to Guritz, HCA's President, J. William Gailbreath ("Gailbreath") was seeking investors to provide initial capital to finance HCA's "Restore Milwaukee" home rehabilitation program. Guritz and Gailbreath represented that HCA would manage Plaintiffs' investments, pay interest annually for a period of five years, and split with Plaintiffs a portion of the profit HCA derived from purchasing, rehabilitating, and selling homes in Milwaukee using Plaintiffs' invested funds.

3.      In or about August 2014, in response to the solicitations and representations of Guritz and Gailbreath, Spurmaxim and the Robert W. Thomas Roth IRA each invested $100,000. These investments were secured by unregistered promissory notes executed by Gailbreath.

4.      HCA timely paid interest to Plaintiffs when such became due in August 2015.

5.      HCA breached each of the notes by failing to pay interest when such became due in August 2016.

6.      HCA further breached each of the notes by refusing to pay the outstanding interest and principal after Thomas and Spyra declared the notes to be in default in 2018 and 2019, respectively.

7.      HCA's total indebtedness on the note issued to Spurmaxim is $121,758, consisting of $26,758 in unpaid interest and $95,000 in unpaid principal.

8.      HCA's total indebtedness on the note issued to the Robert W. Thomas Roth IRA is $130,000, consisting of $30,000 in unpaid interest and $100,000 in unpaid principal.

9.      By engaging in a scheme, act, practice, and/or course of business to defraud Plaintiffs, Defendants have violated Section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b), and Rule 10(b)(5) thereunder, 17 C.F.R. § 240.10-b-5, Section 551.501 of the Wisconsin Statutes, and Sections 815 ILCS 5/12 and 5/13 of the Illinois Code.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1367 (supplemental jurisdiction).

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events, acts, omissions, practices, and courses of business that give rise to Plaintiffs' claims occurred within the jurisdiction of the United States District Court for the Eastern District of Wisconsin, Milwaukee Division.

## PARTIES

12.     Plaintiff Eric Spyra is an Illinois citizen and adult resident of Spring Grove, Illinois.

13.     Plaintiff Spurmaxim, Inc. Profit Sharing Plan is a profit-sharing plan established by Spurmaxim, Inc. Spurmaxim, Inc. is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at 7208 S. Coventry, Spring Grove, Illinois 60081. Spurmaxim Inc.'s registered agent is Eric Spyra. Eric Spyra is the trustee of the Spurmaxim, Inc. Profit Sharing Plan. Spyra is the sole beneficial owner of Spurmaxim, Inc. Profit Sharing Plan.

14.     Plaintiff Robert W. Thomas is an Illinois citizen and adult resident of Chicago, Illinois.

15.     Plaintiff Robert W. Thomas Roth IRA is an individual retirement account. Robert W. Thomas is the sole owner of the Robert W. Thomas Roth IRA. Thomas is solely responsible for the investment decisions of the Robert W. Thomas Roth IRA.

3

16.     Defendant The Heartland Christian Advisors is a non-stock corporation organized and existing under the laws of the State of Wisconsin with its principal place of business located at 4908 Cottage Grove Road, Madison, Wisconsin, 53716. HCA's registered agent is J. William Gailbreath.

17.     Defendant J. William Gailbreath is a Wisconsin citizen and resides at 4908 Cottage Grove Road, Madison, Wisconsin, 53716.

18.     Defendant George D. Guritz is an Illinois citizen and resides at 615 Papermill Hill Drive, Batavia, Illinois, 60510.

19.     Defendants directly and indirectly made use of means and instruments of transportation and communication, means and instruments of interstate commerce, means and instrumentalities of interstate commerce and the mails, in connection with the events, acts, practices, courses of business, and omissions alleged herein.

## FACTS

**A.      Defendants' Fraudulent Offering**

20.     Although Spyra and Thomas were not acquainted with each other as of the year 2014, both had known Guritz for many years through their professional careers.

21.     On or about May 19, 2014, Guritz contacted Thomas by telephone to inform him of an investment opportunity with HCA related to the Restore Milwaukee program.

22.     On or about June 10, 2014, Guritz contacted Spyra by telephone to inform him of an investment opportunity with HCA related to the Restore Milwaukee program.

23.     Guritz told Spyra and Thomas that HCA's President, J. William Gailbreath, was seeking investors to finance HCA's Restore Milwaukee home rehabilitation program.

4

24.     Guritz explained to Spyra and Thomas that the Restore Milwaukee program was designed to accomplish two goals: to rehabilitate blighted properties in the City of Milwaukee and to enable needy families living in Milwaukee to purchase a home of their own.

25.     Guritz stated to Spyra and Thomas that HCA would use Plaintiffs' investments to purchase foreclosed homes from the City of Milwaukee for a nominal amount, rehabilitate the homes, and sell the rehabilitated homes to needy families identified by local church organizations.

26.     Guritz stated to Spyra and Thomas that after HCA had purchased, rehabilitated, and sold a home using Plaintiffs' investments, HCA would split anticipated profits from the sale among Plaintiffs, a local church, and HCA. Guritz cast this proposal as a wonderful investment opportunity that would help restore Milwaukee's city center.

27.     Guritz represented to Spyra that his investment would be secured by property owned by HCA. Spyra relied on that representation in making his decision to invest with HCA in connection with the Restore Milwaukee program.

28.     Thomas was invited by Guritz to visit Milwaukee to learn more about the investment program. In July 2014, Thomas visited Milwaukee with Guritz and met with Gailbreath and a local pastor to tour homes that Thomas was told HCA was considering purchasing as part of the Restore Milwaukee program.

29.     Around this same time, Thomas was introduced to Cindy Klug by Defendants. On information and belief, Cindy Klug is President and Owner of Heartland Christian LLC, an entity affiliated with HCA.

30.     Prior to Plaintiffs' investments, Defendants never disclosed that Plaintiffs' investments would not be secured by any collateral, such as the properties that HCA stated it would purchase and rehabilitate using Plaintiffs' investments.

**B.  Spyra and Thomas Each Invest $100,000 With HCA**

31.     Following Thomas' visit to Milwaukee, Cindy Klug conferred with Guritz, who requested that Cindy send Thomas a draft promissory note relating to his investment.

32.     Klug transmitted a draft promissory note to Thomas in an email dated June 16, 2014.

33.     In her email, Klug described the draft promissory note as "very typical of ones that we use for our investor partners and . . . it is very simple and straightforward." In that email, Klug asked Thomas to "peruse and get back with Bill with any questions or comments."

34.     Klug also stated in her email that she had copied Guritz because the attached draft was "just a sample of one of our Notes[.]"

35.     By letter dated July 22, 2014, Klug sent a draft promissory note to Spyra. In that letter, Klug referenced a conversation between Gailbreath and Guritz, which resulted in the elimination of two sections in a prior draft of the promissory note. The stricken sections contained language incorrectly characterizing Spyra's investment as a charitable donation.

36.     On or about August 4, 2014, Spurmaxim, through its registered agent Eric Spyra, invested $100,000 with HCA.

37.     On or about August 28, 2014, the Robert W. Thomas Roth IRA invested $100,000 with HCA.

### C.    The Relevant Terms Of The Notes

38.    Spurmaxim's investment is reflected in a promissory note dated August 4, 2014 and executed by Gailbreath on behalf of HCA. A true and correct copy of the promissory note issued to Spurmaxim is attached as Exhibit 1.

39.    The Robert W. Thomas Roth IRA's investment is reflected in a promissory note dated August 28, 2014 and executed by Gailbreath on behalf of HCA. A true and correct copy of the note issued to the Robert W. Thomas Roth IRA is attached as Exhibit 2.

40.    Under the terms of the note issued to Spurmaxim, interest on the unpaid principal balance of the note shall accrue at the rate of 12% per year, calculated on the basis on a 360-day year.

41.    Under the terms of the note issued to the Robert W. Thomas Roth IRA, interest on the unpaid principal balance of the note shall accrue at the rate of 15% per year, calculated on the basis of a 360-day year.

42.    Under the terms of both notes, interest shall be payable in five consecutive annual installments commencing at the first anniversary date of the note.

43.    The notes provide that if HCA used the investor's funds to purchase and rehabilitate a home, after the sale of such home, HCA would split the profit equally with one-third each being paid to the investor, HCA, and a local church.

44.    The notes provide, "If the Borrower shall default in the payment of any amount due under this Note and such default shall continue uncured for a period of ten (10) days following the date on which such payment was due, the Lender may, by written notice to the Borrower, declare all amounts due under this Note immediately due and payable."

45. The notes further provide, "All costs, expenses, and expenditures including, and without limitation, the complete legal costs incurred by Lender in enforcing this Note as a result of any default by the Borrower, will be added to the" principal amount "then outstanding and will be immediately paid by the Borrower."

46. The notes do not reference any risk disclosures made to Plaintiffs related to the investments. No separate risk disclosures were provided to Plaintiffs by Defendants prior to their investments.

**D.    Defendants' Material Misrepresentations And Omissions**

47. In seeking and obtaining Plaintiffs' investments, Defendants made material misrepresentations and omissions. Though Plaintiffs are uncertain of the true extent of these material misrepresentations and omissions, representative examples include the following:

48. Prior to Plaintiffs' investments, Defendants did not disclose that Guritz would receive any compensation at all in connection with Plaintiffs' investments with HCA.  In fact, HCA paid Guritz a 10% commission based on the principal amount of Spyra's investment. Plaintiffs are uncertain whether Guritz was paid a commission based on the principal amount of Thomas' investment.

49. The undisclosed fact that HCA would pay Guritz in connection with Spyra's investments was material to Plaintiffs' investment decisions. HCA's payment to Guritz significantly reduced the amount of Plaintiffs' principal investment from which HCA would be able to generate income, which raised the risk that HCA could default on its financial obligations under the notes.

50. At the time of Plaintiffs' investment with HCA, Defendants knew of various risks that would increase the difficulty that HCA would have in paying interest when such became due

8

and/or repaying the principal balance at the end of the terms of the notes. These risks included but were not limited to difficulty obtaining titles to properties from the City of Milwaukee, contractor delays, and/or vandalism and theft by third-parties. Defendants failed to disclose these known risks of the investment when they promoted the investments to Plaintiffs and failed to disclose these risks at any time prior to the dates of their investments.

51.     The omissions of known risks by Defendants were material. Defendants' failure to disclose these known risks deprived Plaintiffs of the ability to understand that HCA would be unable to meet its financial obligations under the notes if HCA's construction projects were unsuccessful. Plaintiffs would have considered this investment to involve a significantly greater risk of default if such information had been disclosed.

52.     The representations made to Plaintiffs that investments would be secured by property owned by HCA were false. In fact, the notes issued to Plaintiffs were not secured by the properties that HCA purchased using Plaintiffs' investments.

53.     Misrepresentations made that investments would be secured by the property HCA purchased were material. The omission by Defendants that Plaintiffs' investments would not be secured by property HCA purchased was material. A reasonable investor would have considered such collateral to provide financial security for HCA's performance under the notes. A reasonable investor would have considered this investment to involve a significantly greater risk of default without such collateral.

54.     Prior to Plaintiffs' investments, Defendants did not disclose that Defendants intended to pay consulting and management fees in excess of Plaintiffs' principal investments. HCA's Income Statement dated as of December 31, 2017, later obtained by Plaintiffs, discloses that HCA had incurred expenses amounting to $224,000 in consulting and management fees –

9

exceeding the principal amount of Plaintiffs' principal investments. Notably, HCA's December 31, 2017 income statement does not reflect expenses associated with home rehabilitation activities.

55.     These omissions were material because Plaintiffs were led to believe that their investments would be used to purchase and rehabilitate homes, not to pay consulting and management fees.  If HCA had disclosed that it would be paying consulting and management fees exceeding the principal amount of Plaintiffs' investment, Plaintiffs would not have made their investments in HCA.

**E.     HCA Defaults Under The Terms Of The Notes And Makes Further Misrepresentations To Plaintiffs' To Lull Them Into Continuing Their Investments**

56.     Plaintiffs received their first initial interest payment pursuant to their investments.

57.     HCA failed to make the second annual interest payments due to Spurmaxim and Thomas when such became due in August 2016.

58.     After Spurmaxim did not receive its interest payment in August 2016, Spyra contacted Guritz by telephone to discuss the missed interest payment.

59.     Guritz asked Spyra to be patient, because Marlene Gailbreath was having health problems. Following that telephone call, Spyra sent Guritz an email detailing the amounts HCA owed to Spurmaxim.

60.     Soon thereafter, Gailbreath contacted Spyra by telephone. Gailbreath stated that HCA was buying in the process of purchasing and closing on properties. Gailbreath further stated that HCA was having problems obtaining clear title to certain properties, and one of the houses it had purchased had burned down. Gailbreath further stated to Spyra that he had "never lost money for anyone" and that he "never had anything go bad." Gailbreath told Spyra, "that's not going to happen."

61.     At the time, Spyra believed, based on Guritz's and Gailbreath's statements, that his investment was secure and that HCA's nonpayment had resulted from ordinary business events.

62.     In February 2017, HCA paid the Robert W. Thomas Roth IRA $15,000, representing HCA's late interest payment for the year 2016.

63.     In March 2017, HCA paid Spurmaxim a total of $25,000, representing HCA's late 2016 interest payment of $12,000, a partial advance payment of $5,000 towards HCA's 2017 interest payment, and an advance repayment of $5,000 in principal on the note issued to Spurmaxim.

64.     In April 2017, HCA paid the Robert W. Thomas Roth IRA $15,000. Thomas considered that payment to represent a prepayment of HCA's 2017 interest payment.

65.     However, since April 2017, HCA has made no further payments to Plaintiffs.

66.     By letter dated September 24, 2018, Thomas notified Gailbreath that the note issued to the Robert W. Thomas Roth IRA was in default and declared all amounts due under the note immediately due and payable.

67.     On or about October 2018, after Gailbreath had not responded to Thomas's September 24, 2018 letter, Thomas called Gailbreath by telephone to discuss the HCA's outstanding payments.

68.     Thomas requested to be paid and stated that he did not want to have to bring attorneys into the situation in order to receive the payment HCA had promised to make.

69.     Gailbreath urged Thomas to continue to be patient and allow Gailbreath to have more time in which to obtain funds sufficient to pay the outstanding amounts. Gailbreath also stated that if Thomas were to sue HCA, Gailbreath would put HCA into receivership.

70.     By letter dated March 6, 2019, Spyra notified Gailbreath that the note issued to Spurmaxim was in default and declared all amounts due under the note immediately due and payable.

71.     To date, Defendants have not paid the amounts due to Spurmaxim under the terms of the investment. HCA owes Spurmaxim in excess of $26,758 in unpaid interest and $95,000 in principal.

72.     To date, Defendants have not paid the amounts due to the Robert W. Thomas Roth IRA under the terms of the investment. HCA owes the Robert W. Thomas Roth IRA $30,000 in interest and $100,000 in principal.

## CLAIMS FOR RELIEF

### COUNT I

**Civil Fraud in Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)(5) Thereunder, 17 C.F.R. § 240.10-b-5 (Against All Defendants)**

73.     Paragraphs 1 through 72 are incorporated by reference.

74.     Each of the promissory notes issued by HCA to Plaintiffs is a security as defined in Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1).

75.     On behalf of HCA, Guritz promoted the securities purchased by Plaintiffs.

76.     Guritz made material misrepresentations and omissions in his conversations with Plaintiffs in connection with Plaintiffs' investments with HCA.

77.     Guritz acted with the intent to deceive, manipulate, and/or defraud Plaintiffs in connection with Plaintiffs' investments with HCA.

78.     Plaintiffs relied on Guritz's material misrepresentations and omissions.

79.     Plaintiffs suffered economic losses, which were caused by Guritz's material misrepresentations and omissions.

12

80. HCA, through Gailbreath, made material misrepresentations and omissions in his conversations with Plaintiffs in connection with Plaintiffs' investments with HCA.

81. HCA, through Gailbreath, acted with the intent to deceive, manipulate, and/or defraud Plaintiffs in connection with Plaintiffs' investments with HCA.

82. Plaintiffs relied on HCA's material misrepresentations and/or omissions.

83. Plaintiffs suffered economic losses, which were caused by HCA's material misrepresentations and omissions.

84. At all times Gailbreath was a control person of HCA.

85. Gailbreath individually made material misrepresentations and omissions to Plaintiffs in connection with Plaintiffs' investments.

86. Plaintiffs relied on Gailbreath's material misrepresentations and omissions.

87. Plaintiffs suffered economic losses, which were caused by Gailbreath's material misrepresentations and omissions.

88. By engaging in the conduct described above, Defendants directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    a. Employed devices, schemes, or artifices to defraud;

    b. Made untrue statements of material facts or omitted to sate material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c. Engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

13

89.    By engaging in the foregoing conduct, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10-b-5.

## COUNT II

### Securities Fraud in Violation of the Wisconsin Uniform Securities Act, Wis. Stat. § 551.501(2) and Wis. Stat. § 551.509(7) (Against All Defendants)

90.    Paragraphs 1 through 89 are incorporated by reference.

91.    Each of the promissory notes issued by HCA to Plaintiffs is an investment contract, which is a form of security.

92.    On behalf of HCA, Guritz promoted the securities issued by HCA and purchased by Plaintiffs.

93.    Guritz made material misrepresentations and omissions in his conversations with Spyra and Thomas in connection with Plaintiffs' investments with HCA.

94.    HCA, through Gailbreath, made material misrepresentations and omissions in his conversations with Spyra and Thomas in connection with Plaintiffs' investments with HCA.

95.    Pursuant to a longstanding decision of the Wisconsin Court of Appeals, recovery under § 551.501(2) does not require any assertion, evidence, or proof of intent to defraud. *State v. Temby,* 108 Wis. 2d 521, 322 N.W.2d 522 (Ct. App. 1982); *accord, State v. Mueller*, 201 Wis. 2d 121, 137-39, 549 N.W.2d 455 (Ct. App. 1996). All that is required is to allege a failure by a defendant to disclose a material fact or misrepresent a material fact of an investment he or she was recommending.

96.    Plaintiffs suffered economic losses, which were caused by Guritz's material misrepresentations and omissions.

97.     Plaintiffs suffered economic losses, which were caused by HCA's material misrepresentations and omissions.

98.     Plaintiffs suffered economic losses, which were caused by Gailbreath's material misrepresentations and omissions.

99.     By engaging in the conduct described above, Defendants directly or indirectly, in connection with the purchase or sale of securities,

   a. Employed devices, schemes, or artifices to defraud;

   b. Made untrue statements of material facts or omitted to sate material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c. Engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

100.    By engaging in the foregoing conduct, Defendants violated Section 551.501 of the Wisconsin Statutes.

101.    At all times, Defendant Guritz was associated with HCA and materially aided in the wrongful conduct against Plaintiffs.

102.    Accordingly, Defendant Guritz is liable under Section 551.501(7) of the Wisconsin Statutes.

103.    At all times, Defendant Gailbreath directly or indirectly controlled the conduct of Defendants HCA and Guritz in their promotion of the investments to Plaintiffs.

104.    At all times, Defendant Gailbreath acted in the capacity of and performing the functions of as an officer or director of HCA.

105.    Accordingly, Defendant Gailbreath is liable under Section 551.501(7) of the Wisconsin Statutes.

## COUNT III

**Securities Fraud in Violation of the Illinois Securities Law of 1953,**
**§ 815 ILCS 5/12 and 815 ILCS 5/13**
**(Against All Defendants)**

106.    Paragraphs 1 through 105 are incorporated by reference.

107.    Each of the promissory notes issued by HCA to Plaintiffs is an investment contract, which is a form of security.

108.    On behalf of HCA, Guritz promoted the securities issued by HCA and purchased by Plaintiffs.

109.    Guritz made material misrepresentations and omissions in his conversations with Plaintiffs in connection with Plaintiffs' investments with HCA.

110.    Guritz acted with the intent to deceive, manipulate, and/or defraud Plaintiffs.

111.    Plaintiffs relied on Guritz's material misrepresentations and omissions.

112.    Plaintiffs suffered economic losses, which were caused by Guritz's material misrepresentations and omissions.

113.    HCA, through Gailbreath, made material misrepresentations and omissions in his conversations with Plaintiffs in connection with Plaintiffs' investments with HCA.

114.    HCA, through Gailbreath, acted with the intent to deceive, manipulate, and/or defraud Plaintiffs.

115.    Plaintiffs relied on HCA's material misrepresentations and/or omissions.

116.    Plaintiffs suffered economic losses, which were caused by HCA's material misrepresentations and omissions.

16

117.     Plaintiffs suffered economic losses, which were caused by Gailbreath's material misrepresentations and omissions.

118.     By engaging in the conduct described above, Defendants directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    a.   Employed devices, schemes, or artifices to defraud;

    b.   Made untrue statements of material facts or omitted to sate material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.   Engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

119.     By engaging in the foregoing conduct, Defendants HCA and Guritz violated the Illinois Securities Law of 1953, 815 ILCS § 5/12 and are liable pursuant to 815 ILCS § 5/13.

120.     At all times, Defendant Gailbreath was a controlling person of Defendants HCA and Guritz and materially aided in violations of the Illinois Securities Law of 1953. Accordingly, Defendant Gailbreath is individually liable under the Illinois Securities Law of 1953, 815 ILCS § 5/13.

## <u>COUNT IV</u>

### Breach of the Spurmaxim, Inc. Profit Sharing Plan Promissory Note
### (Against HCA)

121.     Paragraphs 1 through 120 are incorporated by reference.

122.     The promissory note issued by HCA to Spurmaxim is a valid and enforceable investment contract.

17

123.     Pursuant to the terms of the note issued to Spurmaxim, HCA agreed, among other things:

   a.   to pay Spurmaxim annual interest payments of 12% per year, which were payable in five consecutive annual installments commencing at the first anniversary date of the note;

   b.   to pay Spurmaxim one-third of the profits realized from the sale of any house rehabilitated and sold using Spurmaxim's investment;

   c.   to repay the principal balance of the note on the fifth anniversary of the note; and

   d.   to pay all costs, expenses, and expenditures, including complete legal costs, incurred by Spurmaxim in enforcing the note as a result of HCA's default.

124.     HCA breached the terms of the terms of the note issued to Spurmaxim.

125.     Spurmaxim notified HCA of its default by letter dated March 6, 2019, but HCA has failed to make the payments due under the note issued to Spurmaxim.

126.     Spyra and Spurmaxim have performed all of their duties and obligations under the note issued to Spurmaxim.

127.     Spurmaxim and Spyra have been and will continue to be damaged as a result of HCA's breaches of the note issued to Spurmaxim.

128.     To date, HCA has not paid the amounts due under the note issued to Spurmaxim. HCA currently owes Spurmaxim $26,758 in unpaid interest and $95,000 in principal.

129.     As a direct and proximate result of HCA's breaches of the note issued to Spurmaxim, Spyra and Spurmaxim have suffered damages totaling $121,758, exclusive of interest, costs, and attorneys' fees.

**COUNT V**

**Breach of the Robert W. Thomas Roth IRA Promissory Note**
**(Against HCA)**

130.    Paragraphs 1 through 129 are incorporated by reference.

131.    The promissory note issued by HCA to the Robert W. Thomas Roth IRA is a valid and enforceable investment contract.

132.    Pursuant to the terms of the note issued to the Robert W. Thomas Roth IRA, HCA agreed, among other things:

  a.  to pay the Robert W. Thomas Roth IRA annual interest payments of 15% per year, which were payable in five consecutive annual installments commencing at the first anniversary date of the note;

  b.  to pay the Robert W. Thomas Roth IRA one-third of the profits realized from the sale of any house rehabilitated and sold using the Robert W. Thomas Roth IRA's investment;

  c.  to repay the principal balance of the note on the fifth anniversary of the note; and

  d.  to pay all costs, expenses, and expenditures, including complete legal costs, incurred by the Robert W. Thomas Roth IRA in enforcing the note as a result of HCA's default.

133.    HCA breached the terms of the terms of the note issued to the Robert W. Thomas IRA.

134.    Thomas, on behalf of the Robert W. Thomas Roth IRA, notified HCA of its default by letter dated September 24, 2018, but HCA has failed to make the payments due under the note issued to Robert W. Thomas Roth IRA.

19

135.     Thomas and the Robert W. Thomas Roth IRA have been and will continue to be damaged as a result of HCA's breaches of the note issued to the Robert W. Thomas Roth IRA.

136.     Thomas and the Robert W. Thomas Roth IRA have performed all of their duties and obligations under the note issued to Robert W. Thomas Roth IRA.

137.     To date, HCA has not paid the amounts due under the note issued to the Robert W. Thomas Roth IRA. HCA currently owes the Robert W. Thomas Roth IRA $30,000 in interest and $100,000 in principal.

138.     As a direct and proximate result of HCA's breaches of the note issued to Robert W. Thomas Roth IRA, Thomas and the Robert W. Thomas Roth IRA have suffered damages totaling $130,000, exclusive of interest, costs, and attorneys' fees.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment in their favor and against Defendants for all amounts due and owing under the promissory notes issued by HCA to Plaintiffs, plus further accruing interest, costs, attorneys' fees, expenses, and any other amounts this Court deems to be just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial.

{signature block to follow}

DATED this 31st day of July, 2019.

**HANSEN REYNOLDS, LLC**


By: /s/ James F. Cirincione
     James F. Cirincione
     Brent D. Nistler
     301 N Broadway, Suite 400
     Milwaukee, Wisconsin 53202
     Email: jcirincione@hansenreynolds.com
           bnistler@hansenreynolds.com
     Tel:   (414) 326-4941 (JFC)
           (414) 763-1147 (BDN)
     Fax:   (414) 273-8476

*Attorneys for Plaintiffs*